IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEFFREY S. DOWNS, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANAPOL SCHWARTZ, PC, et al. | : | NO. 14-630 |

### MEMORANDUM

**L. Felipe Restrepo, J.**                                              **August 12, 2015**

Jeffrey S. Downs, Esq. ("Plaintiff" or "Downs") brings this action against his former employer, Anapol Schwartz, P.C. ("the Anapol Firm"), and certain current and former shareholders thereof, Sol Weiss, Esq., Mark J. LeWinter, Esq., James R. Ronca, Esq., and Thomas Anapol, Esq. (collectively, with the Anapol Firm, "the Anapol Defendants").  Downs also brings this action against his onetime future employer, Raynes McCarty, P.C. ("the Raynes Firm"), and certain current shareholders thereof, Stephen E. Raynes, Esq., Harold I. Goodman, Esq., and Martin K. Brigham, Esq. (collectively, with the Raynes Firm, "the Raynes Defendants").

Plaintiff's pending claims against the Anapol Defendants are as follows: (1) retaliation in violation of the Philadelphia Fair Practices Ordinance ("PFPO"), Phila. Code § 9-1101 et. seq. (Count I); (2) defamation (Count II); and (3) false light invasion of privacy (Count III). Plaintiff's pending claims against the Raynes Defendants are as follows: (1) sexual orientation discrimination in violation of the PFPO (Count IV); (2) retaliation in violation of the PFPO (Count V); and (3) defamation, against Stephen Raynes only (Count VI).

The Anapol Defendants and the Raynes Defendants (collectively, "Defendants") move for summary judgment in their favor on all claims.  For the reasons that follow, the Anapol Defendants' motion for summary judgment will be granted with respect to defamation (Count II)

1

and false light invasion of privacy (Count III), and will be denied with respect to retaliation (Count I).  The Raynes Defendants' motion for summary judgment will be granted with respect to sexual orientation discrimination (Count IV) and defamation (Count VI), and will be denied with respect to retaliation (Count V).

I.   **FACTUAL BACKGROUND**[1]

From approximately July 21, 2008, through March 31, 2012, Downs was employed as an associate attorney at the Anapol Firm.  JA 62, 119.  This action arises primarily from events that took place in March 2012 surrounding Downs' resignation from the Anapol Firm, and his anticipated future employment with the Raynes Firm.

Downs is a graduate of the Rutgers University School of Law, is a former federal law clerk, and is an alumnus on Pepper Hamilton LLP and Dechert LLP.  JA 62.  In addition, "Downs is a gay male."  JA 63.

The Anapol Firm and the Raynes Firm are well-known, boutique law firms based in Philadelphia, Pennsylvania.  Among other things, the firms specialize in pursuing complex, high-value personal injury cases on behalf of their clients.  Defendants Sol Weiss ("Weiss"), James R. Ronca ("Ronca"), and Thomas Anapol ("T. Anapol") are all attorneys and shareholders of the Anapol Firm. JA 60, 117-18.  Defendant Mark J. LeWinter ("LeWinter) was a shareholder at the Anapol Firm until March 31, 2012, when he joined the Raynes Firm.  JA 97.  Defendants Stephen E. Raynes ("S. Raynes"), Harold I. Goodman ("Goodman"), and Martin K. Brigham, ("Brigham") are attorneys at the Raynes Firm.  Pl.'s Counter-Statement of Facts in Opp. to

---

[1]      In regards to the Defendants' summary judgment motions, the parties have submitted a Joint Appendix (cited herein as "JA").  Citations to the Joint Appendix correspond to the Bates Numbers for each page; leading zeros are omitted from all Joint Appendix citations.

Raynes Defs.' Summ. J. Mot. ¶¶ 7-9 ("Raynes Facts") (ECF No. 60).[2]  In 2012, Brigham and S. Raynes were members of the Raynes Firm's executive committee, while Goodman was an attorney at the firm.  Id. ¶¶ 9-10.

    A.      **The Facebook Meeting**

The parties are in agreement that after an incident in January 2011, Downs' sexual orientation became generally known by employees at the Anapol Firm.  Pl.'s Counter-statement of Facts in Opp. to Anapol Defs.' Summ. J. Mot. ¶ 18 ("Anapol Facts") (ECF No. 59).  On January 19, 2011, the Anapol Firm held a mandatory meeting to educate employees about the use of social media as a marketing tool (the "Facebook Meeting").  Anapol Facts ¶¶ 13-14; JA 1708.  This meeting was led by Michael Monheit ("Monheit"), the employee in charge of marketing at the Anapol Firm; among those in attendance were LeWinter and Downs.  Anapol Facts ¶ 13; JA 1719-20.  In response to LeWinter's question about what things should not be posted on social media, Monheit responded that "obviously we don't want to post that you are gay . . . bar hopping . . . Especially if you're a teacher."  Anapol Facts ¶ 15.  Downs viewed Monheit's comment as inappropriate, and complained about it to the Anapol Firm's administrator after the meeting.  JA 1719-20.  Following this complaint, numerous emails were exchanged between attorneys and the administrator at the Anapol Firm regarding Downs' complaint and how it should be addressed.  JA 1721, 1726-27.  On January 25, 2011, Monheit called Downs to discuss what occurred at the Facebook Meeting, and subsequently thanked

---

[2]      Regrettably, the parties were unable to work together to comply with this Court's summary judgment procedures, which direct the parties to submit a joint statement of stipulated facts alongside any summary judgment motion.  As a result of the parties' failure in this regard, the Court ordered each of the moving defendants to submit a statement of facts supported by citations to the Joint Appendix.  Plaintiff then responded to these statements by admitting or denying the same, and by similarly citing to the Joint Appendix to support Plaintiff's position.  Any reference to these purported facts should be construed as a reference to the moving party's position and supporting citations, as well as Plaintiff's response and supporting citations.

Downs via email for affording him the opportunity to express his feelings and apologize to Plaintiff.  JA 1723-25.  Largely in response to Downs' complaint about what occurred at the Facebook Meeting, the Anapol Firm scheduled a sensitivity training session entitled "Preventing Harassment, Promoting Respect," which was held on February 17, 2011.  JA 1727, 2082.

Downs alleges, and the Anapol Defendants adamantly deny, that throughout Downs' tenure, there was an unfriendly attitude towards homosexuality at the Anapol Firm.  JA 64, 121.  As examples, Downs identified offensive remarks made on two separate occasions about homosexuality.[3]  JA 1112, 1140.  Apart from these instances, however, it is not apparent from a review of the records that Downs' other allegations of unfair treatment were discriminatory in nature.[4]

---

[3]  In his deposition, Downs testified that Joe Feldman, a shareholder at the Anapol Firm, apologized to Downs for making a comment during a luncheon welcoming Downs to the firm regarding "fags and queers next door giving blow jobs."  JA 1112.  The second set of offensive statements allegedly occurred on March 22, 2012, during a conversation between Downs and T. Anapol.  Anapol Facts ¶¶ 57-58.  Downs asserts that T. Anapol made comments such as, "you don't have a family" and "don't you joke about being gay with your friends?"  JA 1140.  Moreover, Downs mentions that there were "general comments" made by LeWinter that offended Downs, yet Downs does not point to any specific instances.  JA 1125-26.

[4]  Downs' assertions of discriminatory conduct by the Anapol Firm include: (1) his mail not being timely delivered; (2) an employee's use of profanity towards him; (3) his work-related expenses not being timely reimbursed; (4) a fee charged to Downs' stepfather for legal representation by Downs while Downs was employed at the Anapol Firm; and (5) being under-compensated as compared to other associates at the firm.  JA 1155-59, 1163; Anapol Fats ¶ 32.   However, Downs fails to mention that: (1) other employees did not receive mail on time (JA 1953-59); (2) Downs initiated the argument in which another employee used profanity towards the Downs (JA 1942-46, 2048-49); (3) Downs failed to comply with firm policy for reimbursements, and timing for reimbursements did not differ from other employees of the Anapol Firm (JA 1965-86); (4) family members of other employees of the Anapol Firm were charged for legal representation by the firm, and subsequent to Downs raising the issue in his stepfather's case, the Anapol Firm waived the fee (JA 944, 1059-64); and (5) contrary to Downs' contention, records show that Downs' request for a pay raise was in regards to additional tasks Downs was assigned, and made shortly after Downs was already given a pay raise in January of 2011.  JA 1046-48.  Further, the Anapol Firm raised Downs' salary again in March 2011, as requested by Downs.  Id.  Downs offers no factual support for his assertion that other associates were paid higher salaries.

B.     **Planning to Switch Firms**

In the fall of 2011, LeWinter and S. Raynes discussed the possibility of LeWinter joining the Raynes Firm, and ultimately both agreed that LeWinter would join the Raynes Firm.  Anapol Facts ¶ 39.  During his tenure at the Anapol Firm, Downs primarily worked on cases with LeWinter, under LeWinter's supervision.  JA 62, 119.  After LeWinter finalized his plans to join the Raynes Firm in January 2012, LeWinter recommended that the Raynes Firm hire Downs as well.  Anapol Facts ¶¶ 40-41.  Consequently, in early February 2012, Downs interviewed with Brigham and S. Raynes at the Raynes Firm, the Raynes Firm extended an offer of employment to Downs, and he accepted the offer.  Anapol Facts ¶¶ 42-44.  Thereafter, in early February, LeWinter informed Weiss that he planned to resign from the Anapol Firm, effective March 31, 2012, to join the Raynes Firm.  Anapol Facts ¶ 52.  LeWinter informed Weiss and others at the Anapol Firm that Downs would also be leaving the Anapol Firm at the same time to join the Raynes Firm.  Anapol Facts ¶ 53.  Downs and LeWinter were scheduled to join the Raynes Firm on Monday, April 2, 2012.  Anapol Facts ¶ 51.

C.     **The Raynes Firm's Knowledge of Plaintiff's Sexual Orientation**

After accepting the Raynes Firm's offer of employment, Downs visited the Raynes Firm on February 9, 2012.  Raynes Facts ¶ 27; JA 494-95.  During that visit, Brigham invited Downs into his office and stated, among other things, "an employment lawyer would probably tell me not to say this, rumor has it that you're gay and I want you to know that we don't care."  Id. Downs responded to Brigham's statement by saying "yes," and confirmed that he was gay. Raynes Facts ¶¶ 22, 31; JA 1289.  Although there is evidence to suggest that certain members of the Raynes Firm believed that Plaintiff was gay prior to this meeting, and indeed believed that

Downs was gay prior to making the offer of employment,[5] Downs disputes whether members of the Raynes Firm could have truly known that detail about his personal life.  Raynes Facts ¶¶ 22-26.  Nevertheless, the parties agree that as of February 9, 2012, the Raynes Defendants had direct confirmation from Downs that he was gay.  Hr'g Tr. 52:16 – 57:11; Raynes Facts ¶¶ 22, 31.

Following Brigham's conversation with Downs on February 9, 2012, the Raynes Firm took numerous steps in anticipation of Downs' arrival, including: (1) creating a draft press release announcing that LeWinter and Downs were joining the Raynes Firm (JA 68-69); (2) sending an email to the Raynes Firm announcing that LeWinter and Downs would be joining the Raynes Firm in April 2012 (JA 1591); (3) including Downs in a photo with all the Raynes Firm attorneys for publication in the "Super Lawyers" edition of Philadelphia Magazine (JA 1592); (4) holding a wine and cheese party for Downs and LeWinter (JA 1295); (5) paying a deposit to movers in advance of the move of Downs' furniture to the Raynes Firm office. (JA1593-96); (6) printing and sending business cards to Downs that reflected his association with the Raynes Firm (JA 1597); and (7) coordinating updates to the Raynes Firm website so that it would include Downs and LeWinter as of April 1, 2012 (JA 1598).  See also JA 68-69; 1/13/15 Hr'g Tr. 52:3 – 53:11.  In addition, Downs' furniture was scheduled to be moved to the Raynes Firm on March 24, 2012.  JA 1596.

---

[5]     For example, during a December 2011 lunch meeting between LeWinter and Gerald McHugh, a shareholder at the Raynes Firm at the time, which took place weeks before Downs received an offer of employment, McHugh testified that: (1) McHugh asked LeWinter whether Downs would bring diversity to the firm; (2) LeWinter responded by saying "Yes, but not in an obvious way;" (3) McHugh assumed that meant that Downs was gay, and McHugh explained numerous reasons why a gay attorney would feel welcome at the Raynes Firm; and (4) in response to McHugh's explanation, LeWinter said "That's good." JA 576-77, 632.  In addition, Brigham testified that LeWinter told him in late January 2012 that Downs was gay.  JA 492-93.

D.      **The March 22nd Meeting Between Downs and T. Anapol**

On the evening of March 22, 2012, Downs approached T. Anapol at the Anapol Firm's office.  JA 1140.  The details of this meeting are disputed,[6] but the parties agree that Downs raised a number of issues related to his impending departure from the Anapol Firm, including: the payment of fees on cases Downs originated, the handling of a case involving Downs' family member, delayed reimbursement for expenses Downs incurred, compensation for unused vacation time, and the Anapol Firm's response to Downs' complaint regarding the Facebook Meeting.[7]  JA 763-765, 1141.  Downs says that during the meeting they discussed the possibility of a "resolution to many outstanding issues . . . [involving] an eight-month, present-value buyout of [his] cases."  JA 999; see also JA 1005-06.  Downs characterizes this discussion as involving various "issues," but does not agree that anything that transpired amounted to a "litigation threat."  JA 1002.  On the other hand, T. Anapol believed, "[w]ithout a doubt," that Downs was threatening to sue the Anapol Firm during that conversation.  JA 765, 769.

In addition to this factual dispute, the parties do not agree on what Downs said to T. Anapol about what LeWinter's involvement in these issues should be going forward.  The Anapol Defendants take the position that Downs instructed T. Anapol that the Anapol Firm could not relay anything about Downs' issues to LeWinter.  Anapol Facts ¶ 65.  LeWinter viewed this instruction as a betrayal that destroyed his trust and confidence in Downs.  JA 644-45.  Downs takes the position that he expressed that there was no reason to get LeWinter

---

[6]      Critical to the dispute is whether or not Downs made a threat to sue the Anapol Firm during the meeting with T. Anapol, offered to accept money in lieu of bringing a lawsuit against the Firm, and stated LeWinter not be informed about Downs' demand.  Pl.'s Mem. in Opp. to Anapol Defs.' Summ. J. Mot. ("Pl.'s Anapol Br.") (ECF. No. 59) 5; Anapol Defs.' Br. Summ. J. ("Anapol Defs.' Br.") (ECF No. 53-2) 4.

[7]      In response to Downs' inquiries, T. Anapol asked Downs, "Why are you worried about expenses [when] you don't have a family?" and "Don't you joke about being gay with your friends?"  JA 1140; see also JA 765-66.

involved in this discussion, since (1) LeWinter was well aware of all of the issues Downs raised

with T. Anapol, (2) LeWinter was planning to leave the Anapol Firm in a matter of days, and (3)

LeWinter had done nothing to resolve Downs' issues in the preceding weeks.[8]  Anapol Facts ¶

65.  Following the trial in the State Court Action,[9] Defendants argue that the factual dispute over

what Downs said to T. Anapol about involving LeWinter has been resolved by Downs' own

admission.  JA 2192.[10]  Downs argues that his testimony in the State Court Action is consistent

with the position he has taken in this action, and that his testimony in the State Court Action

cannot be parsed and must be viewed in its entirety.  Pl.'s Supp. Anapol Br. (ECF No. 88) 7-10.

     E.     **The Anapol Defendants' Response to the March 22nd Meeting**

On March 22, 2012, shortly after this meeting concluded, T. Anapol called fellow

shareholder Ronca and informed Ronca about the content of his meeting with Downs.  JA 770.

T. Anapol did not contact fellow shareholder Weiss on the evening of March 22nd, but was under

the impression that Ronca was going to contact Weiss about the situation.  Id.

On the morning of March 23, 2012, Ronca called Weiss and relayed his understanding of

what occurred during the meeting between T. Anapol and Downs the previous evening.  JA 933.

Shortly thereafter, T. Anapol emailed Ronca and Weiss, providing what purported to be at least

T. Anapol's partial recollection of his meeting with Downs.  JA 1619-20.  Later in the morning

on March 23rd, Ronca and Weiss participated in a conference call with Gaetan Alfano, outside

---

[8]      Downs claims that because LeWinter already knew about Downs' issues with the Anapol Firm and did not want to get involved, any discussions that the Anapol Firm may have in regards to this matter with LeWinter would constitute "tortious interference" with Downs' "prospective employment" and "business relations."  JA 1001.

[9]      On March 20, 2013, Downs filed a complaint in Pennsylvania state court against the Raynes Firm, the Anapol Firm, Weiss, and LeWinter (the "State Court Action").  Raynes Facts ¶ 129; Anapol Facts ¶ 148.  The State Court Action is discussed in greater detail in Sections I.H and II.

[10]     During cross-examination, counsel for the Anapol Defendants posed the following question to Downs about the March 22nd meeting: "And you specifically told Tom Anapol not to go to Mark LeWinter, correct?"  In response, Downs gave a one word answer – "Yes."

counsel to the Anapol Firm.  JA 933-34.  Following that conference call, Weiss contacted the

other equity shareholders at the Anapol Firm about Downs' meeting with T. Anapol.  JA 934.

Some of Weiss's conversations took place over the telephone, while others were in person.  Id.

Weiss ultimately informed LeWinter about the situation by asking LeWinter to join him for a

walk outside the office.  JA 934-36.  This was not the first time that Weiss and LeWinter had

taken such a walk.  JA 934.  Weiss and LeWinter walked for about twenty minutes around the

blocks surrounding the Anapol Firm's office.  JA 644-45, 936.  Weiss recalls telling LeWinter

that Downs had made a litigation threat for a hostile workplace, wanted eight months' severance,

and specifically requested that LeWinter not be told about any of this.  JA 936.  LeWinter has a

similar recollection of what Weiss told him.  JA 645.  LeWinter claims that he was

"shellshocked" when Weiss informed him of Downs' conversation with T. Anapol.[11]  JA 645.

Following his walk with Weiss, LeWinter called T. Anapol to discuss the situation further.  JA

646-48.  The conversation between LeWinter and T. Anapol lasted about ten minutes, and T.

Anapol confirmed what LeWinter had learned from Weiss during their walk.  JA 648.

     Also on March 23rd, Ronca emailed Downs, requesting that Downs attend an exit

interview at 2:00 PM on Monday, March 26th.  JA 1754.  The email informed Downs that the

Anapol Firm intended to have its outside counsel present at that meeting.  Id.   Approximately

thirty minutes after Ronca sent this email, Downs called Ronca and the two of them spoke for

nearly two hours.  Anapol Facts ¶ 30.  A few hours later, Downs e-mailed Ronca and Weiss,

responding to Ronca's email about scheduling the exit interview.  JA 1675.  Among other things,

the email purported "to be in consideration of a confidential settlement of outstanding issues at

---

[11]    LeWinter testified during his deposition that his emotional response to learning about Plaintiff's conversation with T. Anapol was as follows: "[U]psetting does not do it justice . . . this was an act where [Plaintiff] basically breached the trust that I had in him that was an act of disloyalty."  JA 648.

the firm" and was an effort to further Downs' desire "to reach an out of court settlement . . . to create an exit separation package that included a written understanding of fees with existing cases that I have sourced, a confidentiality clause on both sides, and a severance with a stated offer of 8 months."  Id.  In the email, Downs also wrote the following: "I also stated last night, and continue to understand, that any copy or discussion with Mark LeWinter on this subject is a tortuous [sic] interference with a prospective employment agreement."  Id.  In the email, Downs also stated that he would participate in the exit interview requested by Ronca.[12]  Id.

F.    **The Raynes Defendants' Response to the March 22nd Meeting**

On the evening of March 23, 2012, LeWinter called Brigham to inform him that Downs had made a claim against the Anapol Firm concerning a hostile work environment and had dictated that LeWinter not to be informed about the claim.  JA 501, 652.  Brigham then called S. Raynes about the information provided by LeWinter, and S. Raynes then called LeWinter to confirm the information.  JA 440, 509-510.  Brigham and S. Raynes decided that the move of Downs' furniture on the following day should be postponed.  Id.  In a series of e-mails between Brigham, LeWinter, and S. Raynes, exchanged during the evening of March 23rd and the morning of March 24th, it was agreed that LeWinter would inform Downs not to move his furniture to the Raynes Firm.[13]

On March 25, 2012, Brigham e-mailed Downs to set up a meeting at the Raynes Firm to address Brigham's concern about "the manner in which [Downs] raised the issues" at the Anapol

---

[12]    The Anapol Firm ultimately held an exit interview with Downs at 5:00 PM on March 27, 2012. Anapol Facts ¶¶ 128-29.  The meeting was attended by Downs, Weiss, Ronca, and Gaetan Alfano.  JA 1622.  Downs and the Anapol Defendants were unable to come to an agreement on any issues during this meeting.  See generally JA 1621-68 (transcript of exit interview).

[13]    In these e-mails, S. Raynes wrote that: (1) "if pushed, [LeWinter] will tell [Downs] that we are not hiring him;" (2) Downs was "dishonest;" and (3)  he (S. Raynes) was "glad at least [Downs] revealed his true colors before coming over [to the Raynes Firm]."  JA 1680-81.

Firm.  JA 1682.  The meeting was scheduled for 11:00 AM on March 27, 2012, and was slated to involve Downs, Brigham, and Goodman.  Id.

G.    **The March 27th Meeting at the Raynes Firm**

The parties agree that the March 27th meeting took place as scheduled, but disagree as to what transpired and how it should be characterized.[14]  For example, Goodman believed that Downs was nervous and evasive during the course of the meeting, was "on his own script . . . on his own tangent," and "never directly answered" some of the key questions that Goodman and Brigham asked him.  JA 550.  On the other hand, Downs says that he was not trying to be evasive, but was trying to frame the discussion in terms of what skills he could offer the Raynes Firm, while at the same time trying to move the discussion away from what he perceived to be repeated and inappropriate inquiries about protected activity at the Anapol Firm.  JA 1319.  By way of further example, during the course of the meeting, Goodman believed that Downs "constantly threw Mr. LeWinter under the preverbal [sic] bus at almost any occasion he could regardless of the questions or comments from me and Mr. Brigham and he did it several times." JA 551.  On the other hand, Downs recalls discussing how the Anapol Firm would sometimes create problems by pitting Downs and LeWinter against each other, and that Downs felt he had to address the administrative problems because LeWinter had known about the concerns for some time but had not raised them with the Anapol Firm as of March 22nd.  JA 1320.  However, Downs concedes that during this meeting he: (1) expressed how LeWinter failed to address

---

[14]    The Raynes Defendants recall that during this meeting, Downs was highly critical of LeWinter, recounting LeWinter's alleged failure to effectively address administrative matters and manage client cases.  Raynes Facts ¶¶ 94-99.  The Raynes Defendants also recall that Downs was inconsistent and confrontational in answering questions about his money demand to the Anapol Firm.  Id.  Further, the Raynes Defendants allege that Downs stated he was selling, without client consent, his interest in unresolved contingency cases pending at the Anapol Firm.  Raynes Facts ¶ 96.  Downs disputes the Raynes Defendants' characterization of his conduct and statements and denies stating that he was trying to sell the Anapol Firm his interest in his contingency cases.  Raynes Facts ¶¶ 94-99.

administrative matters; (2) stated he was not raising a claim of hostile work environment against the Anapol Firm; and (3) discussed examples of how he was mistreated by the Anapol Firm.  JA 533-34, 552, 1319-20.  Further, Downs asserts that he informed Brigham and Goodman that during his March 22nd conversation with T. Anapol, Downs had inquired into his internal complaint on a discriminatory comment made during a firm-wide meeting.[15]  JA 1319.

On March 28, 2012, Brigham emailed Downs a letter stating that the Raynes Firm decided to withdraw it offer of employment.  JA 1672-1673.  On April 2, 2012, and July 30, 2012, attorneys for Downs contacted the Raynes Firm and discussed the firm's reasons for withdrawing Downs' offer of employment.  Raynes Facts ¶¶ 119-121.  The Raynes Firm cited Downs' "lack of judgment" and "candor" on both occasions.  Id.

H.     **The Administrative and State Proceedings and Media Coverage Thereof**

On November 8, 2012, Downs filed a complaint with the Philadelphia Human Relations Commission ("PHRC") against the Raynes Firm and the Anapol Firm.[16]  Raynes Facts ¶ 123; Anapol Facts ¶ 145.  In their Answer, filed January 9, 2013, the Raynes Defendants included "lack of candor and integrity, his own poor judgment and his hostility to Mr. LeWinter" as reasons for withdrawing the employment offer.  Raynes Facts ¶¶ 124-125; JA 367.  On December 20, 2013, Downs requested the right to pursue his claim in court, and the PHRC consequently dismissed Plaintiff's complaint and issued a Right to Sue letter.  Raynes Facts ¶ 127; Anapol Facts ¶ 147.

On March 20, 2013, Downs commenced the State Court Action by filing a complaint in the Court of Common Pleas of Philadelphia County.  Raynes Facts ¶ 129; Anapol Facts ¶ 148.

---

[15]     The Raynes Defendants contend that on March 27th, Downs denied that he had discussed the issue of a hostile work environment in his conversation with T. Anapol on March 22nd.  JA 280, 552.
[16]     The PHRC complaint also included as defendants: Brigham, Goodman, Weiss, Anapol, Feldman, Monheit and LeWinter.  Raynes Facts ¶ 123; Anapol Facts ¶ 145.

On July 2, 2013, Downs stipulated to dismissing the Raynes Firm from the State Court Action. Raynes Facts ¶ 131.  On October 6, 2013, the Anapol Firm, Weis, and LeWinter filed their Answer to Amended Complaint with New Matter in the State Court Action.  JA 238-73.  That Answer with New Matter included, among other things, the following statements: (1) "Plaintiff's demand for $80,000 as 'severance' was nothing more than a shake down" (JA 252); (2) "Plaintiff's allegations of discrimination and a hostile work environment were false, and Plaintiff asserted those allegations solely to obtain a monetary settlement in order to alleviate Plaintiff's ongoing financial distress" (JA 264); and (3) "Plaintiff, while working at Anapol Schwartz, had ongoing financial debt and owed a substantial amount of money to various credit cards . . . [and that] in August 2011, Capital One Bank filed a Complaint against Downs for $11,119.21 in unpaid credit card debt" (JA 264).

On October 8, 2013, Law 360 published an article regarding the Answer with New Matter from the Anapol Firm, Weiss, and LeWinter.  JA 1819.  In that Article, the author stated that Downs "tried extorting the [Anapol] firm out of $80,000 before resignation."  Id.  Following Downs' filing of his Complaint in this Court, the Legal Intelligencer published an article on February 10, 2014, regarding his claims in the Federal Action.  JA 1796.  On February 12, 2014, the shareholders of the Anapol Firm submitted a Letter to the Editor of the Legal Intelligencer regarding the claims in the Federal Action.  JA 1790.  On February 18, 2014, the Legal Intelligencer published the Letter to the Editor submitted by the Anapol Firm ("Letter to the Editor").  JA 1801.  The Letter to the Editor described Downs' accusations as "completely baseless," stated that Downs "asked that his claim before the Philadelphia Commission on Human Relations be dismissed before the commission issued a decision," and "encourage[d] The

13

Legal and its readers to continue to follow this story closely.   Read about the issues that come up in discovery.   Study any decisions that come down.  We have nothing to hide." Id.

II.    **PROCEDURAL HISTORY**

Plaintiff filed his original Complaint on January 27, 2014, alleging unlawful discrimination and retaliation in violation of PFPO by both the Anapol Defendants and the Raynes Defendants.  ECF No. 1.  Defendants filed Answers on April 1, 2014.  ECF Nos. 4, 6.  After the pretrial conference on July 9, 2014, this Court ordered that the discrimination claim against the Anapol Defendants be dismissed with prejudice, per Plaintiff's request.  ECF No. 16.

On August 26, 2014, Plaintiff filed a motion for leave to amend his Complaint, seeking to add claims of defamation and false light invasion of privacy against the Anapol Defendants and a claim of defamation against Defendant S. Raynes.  ECF No. 23.  Defendants filed opposition papers and Plaintiff submitted reply papers in support of his motion.  ECF Nos. 26-29.  This Court granted Plaintiff leave to amend the Complaint on October 3, 2014, and Plaintiff filed his Corrected Amended Complaint on October 9, 2014.  ECF Nos. 31, 35.  Defendants filed their Answers to the Corrected Amended Complaint on October 27, 2014.  ECF Nos. 41-42.

On November 10, 2014, the Raynes Defendants and the Anapol Defendants each moved for summary judgment on all claims against them.  ECF Nos. 52-53.  Initially, Plaintiff moved to strike Defendants' Motions for Summary Judgment, which this Court subsequently denied.  ECF Nos. 55-58.  The parties submitted response papers and reply papers in support of their respective positions regarding the Defendants' Motions for Summary Judgment.   ECF Nos. 59-60, 64-65.  The Court held oral argument on Defendants' summary judgment motions on January 13, 2015.  ECF Nos. 66-67.

On April 27, 2015, the trial in the State Court Action began, wherein Downs pursued a claim for defamation against LeWinter, and pursued a claim of intentional interference with a prospective contractual relationship against the Anapol Firm, Weiss, and LeWinter.  On May 8, 2015, the Hon. Kenneth J. Powell, Jr. granted in part a defense motion for compulsory nonsuit, dismissing Weiss from the case at the conclusion of Plaintiff's evidence.  JA 2199-2209.  On May 12, 2015, the jury returned a unanimous verdict in favor of the remaining defendants on all claims.  JA 2180-84.  The parties to the State Court Action have filed various post-trial motions, and Plaintiff has filed a Notice of Appeal to the Pennsylvania Superior Court.[17]

Following the State Court Action, the parties submitted supplemental papers in support of their respective summary judgment positions and also supplemented the Joint Appendix.  ECF Nos. 85-90, 94, 97-98.  On June 22, 2015, the Court heard oral argument on the points raised by the parties in their supplemental summary judgment papers.  ECF Nos. 91, 96.  Defendants' motions for summary judgment are now ripe of disposition.

III.   **JURISDICTION & LEGAL STANDARD**

Federal question jurisdiction does not apply to this action, as Downs only asserts claims grounded in Pennsylvania state law and a local Philadelphia ordinance.  Nevertheless, this Court has subject-matter jurisdiction over this dispute, as the requirements for diversity jurisdiction set forth in 28 U.S.C. § 1332(a) have been met.  Plaintiff, a citizen of New Jersey, is completely diverse from the Defendants, all of whom are citizens of Pennsylvania, and the amount in controversy exceeds $75,000.

Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A dispute as to a

---

[17]   On August 11, 2015, counsel for the Anapol Defendants informed the Court that the Superior Court of Pennsylvania quashed Plaintiff's appeal because there are post-trial motions still pending in the Court of Common Pleas of Philadelphia County.

material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  On a motion

for summary judgment, the court must consider the "underlying facts and all reasonable

inferences therefrom in the light most favorable to the party opposing the motion."  Slagle v.

Cnty. of Clarion, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted).  If the movant carries its

initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go

beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial."

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  That is, the non-moving party "must

present more than just bare assertions, conclusory allegations or suspicions to show the existence

of a genuine issue."  Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (citation

and internal quotation marks omitted).  Summary judgment must be granted against a non-

moving party who fails to sufficiently "establish the existence of an essential element of its case

on which it bears the burden of proof at trial."  Blunt v. Lower Merion Sch. Dist., 767 F.3d 247,

265 (3d Cir. 2014).

IV.   **DISCUSSION**

   A.   **Claims Against the Anapol Defendants**

   The Anapol Defendants argue that the Downs cannot establish his claims of retaliation,

defamation, and false light invasion of privacy against them.  Each claim is addressed in turn.

      1.   Count I - Retaliation

   Under the PFPO, it is unlawful "[f]or any person to harass, threaten, harm, damage, or

otherwise penalize, retaliate or discriminate in any manner against any person because he, she or

it has complied with the provisions of this Chapter, exercised his, her or its rights under this

Chapter, enjoyed the benefits of this Chapter, or made a charge, testified or assisted in any

16

manner in any investigation, proceeding or hearing hereunder."  PFPO § 9-1103(1)(g).  Under

the PFPO, it is also unlawful "for any person to aid abet, incite, induce, compel, or coerce the

doing of any unlawful employment practice or to obstruct or prevent any person from complying

with the provisions of this Section or any order issued hereunder or to attempt directly or

indirectly to commit any act declared by the Section to be an unlawful employment practice."

PFPO § 9-1103(1)(h).

       Retaliation claims brought under the PFPO are analyzed in the same manner as Title VII

retaliation claims; hence, the McDonnell Douglas[18] burden-shifting analysis applies.  Glover-

Daniels v. 1526 Lombard St. SNF Operations LLC, 2012 WL 2885935, at *6 (E.D. Pa. July 16,

2012); Smith v. Thomas Jefferson Univ., 2006 WL 1887984, at *3 (E.D. Pa. June 29, 2006)).

Under the McDonnell Douglas framework, to establish a prima facie case of retaliation a

plaintiff must demonstrate that: (1) they engaged in activity protected by law; (2) the employer

took an adverse employment action against them; and (3) there was a causal connection between

their participation in the protected activity and the adverse employment action.  Moore v. City of

Phila., 461 F.3d 331, 341 (3d Cir. 2006).  Once a plaintiff carries the burden of making out a

prima facie case, "the burden shifts to the employer to advance a legitimate, non-retaliatory

reason" for its actions.  Id. at 342.  The final burden is on the plaintiff to "convince the factfinder

both that the employee's proffered explanation was false, and that retaliation was the real reason

for the adverse employment action."  Exantus v. Harbor Bar & Brasserie Rest., 386 F. App'x

352, 355 (3d Cir. 2010) (citation and internal quotation marks omitted).  To overcome a

summary judgment motion, a plaintiff must point to evidence that is sufficient to discredit the

defendant's proffered reasons, but need not produce additional evidence beyond his or her prima

---

[18]    McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

facie case.  Burton v. Teleflex Inc., 707 F.3d 417, 427 (3d Cir. 2013) (citing Fuentes v. Perskie,

32 F.3d 759, 764 (3d Cir.1994)).

i.    <em>Protected Activity</em>

As to the first element, "the employee must hold an objectively reasonable belief, in good

faith, that the activity" opposed is a violation of law.  Theriault v. Dollar Gen., 336 F. App'x

172, 174 (3d Cir. 2009).  Hence, in order for the complaint to be protected, it must be believable

to a reasonable person that the complained of conduct amounted to unlawful discrimination.  Id.

Furthermore, "protesting what an employee believes in good faith to be a discriminatory practice

is clearly a protected activity."  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d

Cir. 1996).  Because the Anapol Defendants concede, for purposes of summary judgment, that

Plaintiff satisfies the first element of establishing a prima facie case of retaliation, the Court

continues to the second prong of the analysis.  Anapol Defs. Br. 12.

ii.    <em>Adverse Employment Action</em>

Plaintiff alleges that the Anapol Defendants retaliated against him "by failing to promote

Plaintiff, failing to pay Plaintiff commensurate with his skills and contributions, delaying and

denying expense reimbursements, arbitrarily taking attorney's fees from a family member case,

[and] failing to give adequate administrative and other paralegal support."[19] Compl. ¶ 87.

Plaintiff also alleges that the Anapol Defendants "put repeated pressure on LeWinter not to allow

---

[19]     Though these allegations appear in Plaintiff's Corrected Amended Complaint, the Court deems them to be waived.  Over the course of two oral arguments on Defendants' summary judgment motions, Plaintiff has failed to rely on the allegations contained in paragraph 87 of the Corrected Amended Complaint in the face of repeated and direct questions from the Court to articulate the parameters of the adverse employment actions.  See, e.g., 1/13/15 Hr'g Tr. 14 ("THE COURT:  And the adverse employment action is?  MS. ASHBACH:  The adverse employment action is that this information that Mr. Downs was raising threats of hostile work environment was relayed to Mr. LeWinter."); id. at 18 (after discussing at length how LeWinter was told about the hostile work environment and then relayed that information to the Raynes Firm, "MS. ASHBACH:  So that's the adverse employment action.  That's basically inciting activity.  And Mr. LeWinter admits to Jeffrey Downs that he didn't want him to raise claims of hostile work environment."); 6/22/15 Hr'g Tr. 27:25 – 28:7, 31:6 – 38:15).

18

Plaintiff to commence employment at the Raynes Firm."  Compl. at ¶ 89.  Plaintiff further alleges that the Anapol Defendants "retaliated and conspired against the Plaintiff by 'aiding, inciting, abeting [sic] and coercing' the Raynes firm and S. Raynes, Brigham, and Goodman to deny the Plaintiff employment . . . due to allegations made by the Anapol Defendants that Plaintiff was engaged in a protected activity."  Compl. at ¶ 88.

Initially, the Anapol Defendants argued that Downs has failed to identify how the various Anapol Firm shareholders telling each other and how LeWinter telling the Raynes Firm about Downs' actions satisfied the adverse employment action requirement of the prima facie case. Anapol Defs. Br. 12-14.  Following the State Court Action, the Anapol Defendants also argued that Downs should be collaterally estopped from pursing his retaliation claim because it is premised on whether the Anapol Defendants interfered with Downs' employment at the Raynes Firm, and "[t]he question of whether the Anapol Defendants interfered with Downs' employment was decided in the state court action."  Anapol Defs. Supp. Br. (ECF No. 86) 5.

(a)      Collateral Estoppel

The Pennsylvania Supreme Court has held that five requirements must be met to give rise to collateral estoppel: (1) the issue decided in the prior case is identical to the one presented in the later action; (2) there was a final adjudication on the merits; (3) the party against whom the plea is asserted was a party on in privity with a party in the prior case; (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment. Metro. Edison Co. v. Pennsylvania Pub. Util. Comm'n, 767 F.3d 335, 350 (3d Cir. 2014) (citing Office of Disciplinary Counsel v. Kiesewetter, 889 A.2d 47, 50-51 (Pa. 2005)).  The Anapol Defendants argue that all five requirements are satisfied here.  Anapol Defs. Supp. Br. 4-7.

19

Downs argues that both the first and fourth requirements are absent.  Pl. Supp. Opp. to Anapol (ECF No. 88) 2-6.  The Court agrees with the parties that the second, third, and fifth requirements for collateral estoppel are satisfied by the trial in the State Court Action.

In order to determine whether or not the first and fourth requirements have been satisfied the Court must first decide what "the issue" was that was decided in the State Court Action.  A review of the verdict sheet from the State Court Action reveals that the jury was asked the following question and gave the following answer with respect to Downs' claim that the Anapol Firm and LeWinter engaged in intentional interference with a prospective contractual relationship:

> Do you find that Plaintiff, Jeffrey Downs, has established by a preponderance of the evidence that Anapol Schwartz and Mark LeWinter engaged in an intentional action with the specific intent to cause the prospective contractual relationship between Plaintiff and Raynes McCarty from being entered into?
>
> No ____X____        Yes _____

JA 2183.  Thus, the only issue decided by the jury in the State Court Action that is relevant to this proceeding is exactly that – the Anapol Firm and Mark LeWinter did not engage in an intentional action with the specific intent to cause the prospective contractual relationship between Plaintiff and Raynes McCarty from being entered into.[20]

Considering the scope of "the issue," the Court is not persuaded by Downs' arguments as to the fourth requirement.  While Downs may be correct that he "in no way had the full and fair opportunity to litigate and try the claim of retaliation" (Pl. Supp. Opp. to Anapol 6), he certainly had a full and fair opportunity to litigate "the issue" as identified above – indeed, that was the primary focus of the trial in the State Court Action.  To the extent that Downs suggests that he

---

[20]    Since Judge Powell granted Weiss' motion for non-suit at the close of Plaintiff's case, the same bar that applies to the Anapol Firm and LeWinter would also apply to Weiss.

was denied a "full and fair opportunity" to litigate in the State Court Action due to "substantial and glaring reversible error" committed by the judge in the State Court Action (Pl. Supp. Opp. to Anapol 1), the Court is unmoved by that argument.  It is not the function of this Court to serve as an appellate court for the State Court Action, and until and unless an appropriate appellate court makes a determination to the contrary, the Court must operate under the assumption that Judge Powell presided over a fair and impartial trial.

With respect to the first requirement, as is so often the case, the truth lies somewhere in the middle.  The Court does not agree with the Anapol Defendants view that Downs' "retaliation claim depends entirely on the same issue that was litigated in state court" (Anapol Defs. Supp. Br. 6), nor does the Court agree with Downs that the result in the State Court Action has no impact on the litigation of the issues in this action.  Rather, it is the opinion of this Court that the result in the State Court Action means that Plaintiff is precluded from pursuing a theory that the Anapol Defendants retaliated against him by "engag[ing] in an intentional action with the specific intent to cause the prospective contractual relationship between Plaintiff and Raynes McCarty from being entered into."  Having closely evaluated Plaintiff's Corrected Amended Complaint, this ruling means that Plaintiff is precluded from pursuing his retaliation claim against the Anapol Defendants as it is set forth in paragraphs 88, 91, and 92[21] thereof.  Plaintiff, however, is not precluded from pursuing properly plead, non-waived retaliation theories to the extent that they differ from what is specifically ruled out above.  This means that Plaintiff is not precluded from pursuing his retaliation claim against the Anapol Defendants as it is set forth in paragraphs 89 and 92 (as modified herein by footnote 21) of his Corrected Amended Complaint.

---

[21]     The verdict in the State Court Action precludes Downs from arguing that that Anapol Defendants acted with malicious or willful intent.  However, Downs may argue that the Anapol Defendants recklessly interfered with his ability to commence employment at the Raynes Firm, as recklessness represents a lower scienter requirement than what was presented in the State Court Action.

(b)        Other Conduct and Theories

"For an employer's action to satisfy the second prong of a prima facie case of retaliation, the plaintiff 'must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 195 (3d Cir. 2015) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

In a post-employment retaliation context,[22] where a former employee files a retaliation action against a previous employer, "[a] former employer engages in retaliation where its action results in discharge from a later job, a refusal to hire the plaintiff, [] other professional or occupational harm . . . [that is,] some harm to an employee's employment opportunities." Boandl v. Geithner, 752 F. Supp. 2d 540, 567-68. (E.D. Pa. 2010) (citation and internal quotation marks omitted).  A negative reference given by a former employer to a prospective employer can be an adverse employment if it impacts a former employee's future employment.  See Robinson v. Shell Oil Co., 519 U.S. 337 (1997) (holding that Title VII protects both current and former employees from retaliation, and refraining from holding that a negative employment reference cannot be an adverse employment action under Title VII); E.E.O.C. v. L.B. Foster Co., 123 F.3d 746, 754 (3d Cir. 1997) (failing to give an employment reference about a former employee to a prospective employer, when such references were typically given for former employees, constituted a sufficiently adverse employment action for a Title VII retaliation claim); Jones v.

---

[22]        Technically, Downs was still associated with the Anapol Firm in late March 2012 when the alleged retaliation took place.  However, the alleged retaliation occurred: (1) after Downs had already announced his intention to leave the Anapol Firm; (2) with approximately one week remaining on his tenure at the Anapol Firm, and (3) where Downs had accepted an offer employment to start at the Raynes Firm on the first business day after his departure from the Anapol Firm.  Under these somewhat unique circumstances, the Court is convinced that the most appropriate way to view the retaliation claim against the Anapol Defendants is in the post-employment context.

WDAS FM/AM Radio Stations, 74 F. Supp. 2d 455, 464 (E.D. Pa. 1999) (acknowledging that a negative employment reference can constitute the adverse employment action for a Title VII retaliation claim).[23]

Here, the allegation is not that the Anapol Defendants gave a negative employment reference in the first instance or that they refused to give an employment reference at all, but rather that they caused a positive employment reference to be withdrawn.  While there is undoubtedly some difference between withdrawing an employment reference on the one hand, and refusing to give any reference or giving a negative reference on the other hand, the Court is convinced that when the withdrawal of an employment reference can, under the right circumstances, be a sufficiently adverse employment action for the purpose of a PFPO retaliation claim.  Here, the withdrawal of the employment reference resulted in Downs, at a minimum, (1) having to endure and successfully navigate an additional in-person interview to preserve his previously accepted job offer – an interview that otherwise would not have taken place, and (2) having his reputation diminished in the eyes of the Raynes Defendants to some degree.  At most, the withdrawal of the employment reference caused Downs to lose his future position at the Raynes Firm.  Even taking into account the preclusive effect of the verdict in the State Court Action, the Court is satisfied that the withdrawal of the employment reference satisfies the adverse employment action requirement for purposes of Plaintiff's prima facie case of retaliation against the Anapol Defendants.

---

[23]     See also Hashimoto v. Dalton, 118 F.3d 671, 674 (9th Cir. 1997) (holding that the employer's "dissemination of the negative job reference is an actionable employment decision"); Hillig v. Rumsfeld, 381 F.3d 1028, 1035 (10th Cir. 2004) (a showing of more than de minimus harm to future employment prospects includes negative job references); Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999) (permitting a finding of an adverse employment action where the prospective employer refuses to hire the plaintiff due to a negative reference by the former employer).

iii.   *Causation*

To establish the third and final element of a prima facie case of retaliation, causation, a plaintiff must establish that his protected activity was a but-for cause of the adverse action taken by his employer.  Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013).  In other words, it is not sufficient for a plaintiff to prove that their protected act was one of several motivating factors – a plaintiff must "prove that the protected act was *the* motivating factor, absent which no firing would have occurred."  Conner v. Ass'n of Flight Attendants-CWA, 2014 WL 6973298, at *5 (E.D. Pa. Dec. 10, 2014).  "[T]emporal proximity between the employee's protected activity and the alleged retaliatory action may satisfy the causal link element of a prima facie retaliation claim, at least where the timing is 'unusually suggestive of retaliatory motive.'" Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000) (internal citation omitted).   The Third Circuit has recognized that a temporal proximity of two days is unusually suggestive of retaliatory motive.  Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989).

Downs' initial complaint to the Anapol Firm was lodged on or about January 19, 2011. During his March 22nd meeting with T. Anapol, Downs expressed new concerns about the environment at the Anapol Firm and also raised concerns about the Anapol Firm's response to the complaint he lodged on or about January 19, 2011.  As detailed above, the March 22nd meeting triggered a series of events, but most importantly for the causation analysis, by March 23, 2012, LeWinter had contacted the Raynes Firm and effectively withdrawn his positive employment reference for Downs.  Because the temporal proximity here is less than two days, in light of the Third Circuit's previous recognition that a temporal proximity of two days is unusually suggestive of a retaliatory motive, Downs is able to establish the causation element of his prima facie case.

iv.   *Legitimate Non-Retaliatory Reason*

Since Plaintiff has carried his burden of establishing a prima facie case of retaliation, the Anapol Defendants must provide some "legitimate, non-retaliatory reason" for its conduct. Exantus, 386 F. App'x at 355.  The Anapol Defendants assert that LeWinter was compelled to inform the Raynes Defendants about the March 22nd Meeting because the Raynes Firm had decided to hire Plaintiff based solely on LeWinter's recommendation, and Plaintiff's actions invalidated that recommendation.  Anapol Defs. Br. 18.  Specifically, the Anapol Defendants contend that they "perceived Plaintiff's demand for 'severance' as a litigation threat" that warranted notifying all equity shareholder in the Anapol Firm, and that Plaintiff's "directive that LeWinter not be told of his demand was a betrayal of trust" and unethical.  Id. at 16-17.  The proffered legitimate, non-retaliatory reasons for the Anapol Defendants' conduct are sufficient to shift the burden back to Downs to show pretext.

v.   *Pretext*

Because the Anapol Defendants have articulated legitimate, non-retaliatory reasons for withdrawing Downs' positive employment reference, the burden shifts to Downs to identify, evidence from which a reasonable juror could disbelieve the proffered legitimate, non-retaliatory reasons.  Moore, 461 F.3d at 342.

First, Downs argues that the Anapol Defendants' articulated reasons should be disbelieved because T. Anapol's  nearly contemporaneous written summary of his meeting with Downs makes no reference to the fact that Downs allegedly directed T. Anapol not to discuss their meeting with LeWinter.  Anapol Facts ¶ 66; JA 1619-20.  Downs argues that its absence from T. Anapol's email to Weiss and Ronca demonstrates that T. Anapol did not view Downs' directive about not telling LeWinter as important, or at least not as important as the three points

summarized by T. Anapol – "Hostile Work Environment," "Unfair employment practices," and "improper[] termination." Id.  Downs also points to LeWinter's strong desire to leave the Anapol Firm on good terms (JA 657) – citing it as evidence that LeWinter was upset by Downs jeopardizing LeWinter's amicable departure by raising claims at the Anapol Firm, and not by the "betrayal of trust" caused by Downs directing the Anapol Firm not to include LeWinter in the discussions. See 1/13/15 Hr'g Tr. 18, 94-95; Pl.'s Anapol Br. 19.  Also, Downs points to the fact that the Anapol Firm did not notify their insurance carrier of a potential claim by Downs until April 2, 2012, as evidence that the Anapol Defendants did not truly believe that Downs' actions implicated any duty to notify all shareholders of the Anapol Firm.  Anapol Facts ¶ 66; JA 1996.

When viewed in concert with the evidence in support of his prima facie case, Plaintiff has identified some evidence by which a reasonable juror could disbelieve the Anapol Defendants' proffered legitimate, non-retaliatory reasons for their actions.  This is enough to present this claim to a jury.  Accordingly, the Anapol Defendants' motion for summary judgment will be denied with respect to Count I

### 2.   Count II – Defamation

To establish a claim for defamation under Pennsylvania law, a plaintiff must prove: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion.  42 Pa. Cons. Stat. § 8343.

Whether a statement can be construed as having a defamatory meaning is a question of law for the court to decide.  Marcone v. Penthouse Int'l Magazine For Men, 754 F.2d 1072, 1078

(3d Cir. 1985).  In deciding whether the publication is defamatory, the court must consider the effect the statement would "fairly . . . produce . . . in the mind of the average persons among whom it is intended to circulate."  Tucker v. Fischbein, 237 F.3d 275, 282 (3d Cir. 2001) (citation omitted).  Even if the court determines that the statement is capable of a defamatory meaning, "[a] defendant may avoid liability for defamation if it shows that its statements were 'substantially true.'"  Graboff v. Colleran Firm, 744 F.3d 128, 136 (3d Cir. 2014) (citations omitted).

"However, a defamatory statement must be viewed in context, and a defendant cannot use truth as a defense where 'the implication of the communication as a whole was false,' even if the statement is 'literally accura[te].'"  Id. (internal citations omitted).  Furthermore, numerous recent cases have recognized the viability of defamation by innuendo theory under Pennsylvania law, whereby a statement can be defamatory when it creates a false implication when viewed in context.  See Graboff, 744 F.3d at 136 (citing Dunlop v. Phila Newspapers, Inc., 448 A.2d 6, 18 (Pa. Super. Ct. 1982)); Mzamane v. Winfrey, 693 F. Supp. 2d 442, 476-78 (E.D. Pa. 2010).  Importantly, a publication cannot be made libelous "by innuendo which puts an unfair and forced construction on the interpretation of the publication."  Bogash v. Elkins, 176 A.2d 677, 679 (Pa. 1962) (quoting Sarkees v. Warner-West Corp., 37 A.2d 544, 546 (Pa. 1944)).

Further, a statement of opinion is actionable only if it "implies the existence of undisclosed facts."  Stein v. City of Phila., 2013 WL 6408384, at *9 (E.D. Pa. Dec. 5, 2013), see also Giordano v. Claudio, 714 F. Supp. 2d 508, 527 (E.D. Pa. 2010).  A person's "comment[s] as to another's conduct, qualifications or character after [] stating the facts on which he bases his opinion," are non-actionable "pure opinions."  Rockwell v. Allegheny Health, Educ. & Research Found., 19 F. Supp. 2d 401, 406 (E.D. Pa. 1998); see also Baker v. Lafayette Coll., 516 Pa. 291,

297 (1987).  This is because "a listener may choose to accept or reject [the defamatory opinion]

on the basis of an independent evaluation of facts."  <u>Redco Corp. v. CBS, Inc.</u>, 758 F.2d 970, 972

(3d Cir. 1985).

     Downs alleges that two separate categories of statements by the Anapol Defendants are

defamatory.  First, Downs points to certain statements contained in the Anapol Defendants

Answer and New Matter filed in the State Court Action.  Second, Downs points to certain

statements contained in the Letter to the Editor.

i.   <i>Answer and New Matter</i>

     A statement is entitled to absolute immunity from a defamation claim if it is "issued as a

regular part of legal proceedings" and "pertinent and material to the proceedings."  <u>Bochetto v.

Gibson</u>, 860 A.2d 67, 71 (Pa. 2004).  However, a statement may no longer be privileged if it is

later republished to an audience outside of the proceedings.  <u>Id.</u>  If the defendant raises the

defense of judicial privilege, the plaintiff has the burden of proving abuse of the privilege.  <u>U.S.

Healthcare, Inc. v. Blue Cross of Greater Phila.</u> 898 F.2d 914, 923 (3d Cir. 1990).

     The Anapol Defendants have properly raised the defense of judicial privilege by pleading

it as an affirmative defense in their Answer to the Amended Complaint (ECF No. 42 at 22), and

by reasserting the defense in their Motion for Summary Judgment (ECF No. 53 at 25-27).[24]

While the Anapol Defendants have clearly met their burden in raising the defense of judicial

privilege, Plaintiff has not met his burden in proving that the conduct of the Anapol Defendants

amounts to an abuse of that privilege.

---

[24]    Furthermore, by asserting that the Anapol Defendants have "waived" the privilege, Plaintiff acknowledges that the allegedly defamatory statements in the Answer and New Matter would have otherwise been protected by judicial privilege in the first instance.  Pl.'s Anapol Br. 28.

"[E]ven an absolute privilege may be lost through overpublication . . . [i]n the case of the judicial privilege, over-publication may be found where a statement initially privileged because made in the regular course of judicial proceedings is later republished to another audience outside the proceedings." Pawlowski v. Smorto, 588 A.2d 36, 41 n.3 (Pa. Super. Ct. 1991); see also Bochetto, 860 A.2d at 72-73 (holding that a defendant's publication of the complaint to a reporter by sending the reporter a copy of the document was not protected by the judicial privilege); Barto v. Felix, 378 A.2d 927, 930 (Pa. Super Ct. 1977) (holding that a public defender's recitation of the content of his appellate brief at a press conference was not protected by the judicial privilege, which otherwise would have applied to the statements in the brief).  The Anapol Defendants' conduct stands in stark contrast to the defendants' conduct in Bochetto and Barto.  Here, the Anapol Defendants did not send their Answer and New Matter to the Legal Intelligencer, nor did they read portions of it aloud at a press conference.  In fact, the Answer and New Matter was not even referenced in the Letter to the Editor, and absent some additional, independent investigation, a reader of the Letter to the Editor would have no idea that the Answer and New Matter existed.  See JA 1801.  Rather, the Anapol Defendants merely, and rather benignly, "encourage[d] The Legal and its readers to continue to follow this story closely.  Read about the issues that come up in discovery.  Study any decisions that come down."  Such statements do not amount to a "republishing" of the Answer and New Matter in the Legal Intelligencer.

As noted above, because the conduct of the Anapol Defendants was so different from the conduct of the defendants in Bochetto and Barto, and because Plaintiff is unable to demonstrate that the Anapol Defendants engaged in conduct that republished the Answer and New Matter or the alleged defamatory comments contained therein, those statements are protected by judicial

privilege and are not actionable.  Accordingly, the Anapol Defendants' motion for summary judgment will be granted with respect to this portion of Count II.

ii.    *The Letter to the Editor*

Downs' defamation claim with respect to the Letter to the Editor is based on two sections thereof: (1) the Anapol Defendants' characterization of Downs' accusations as "completely baseless;" and (2) the Anapol Defendants' description of the three formal accusations that Downs filed, which included a statement that Downs asked that his PCHR claim "be dismissed before the commission issued a decision."  As stated by Plaintiff: "Plaintiff does not contend that the statement that Downs [sic] claims are 'baseless' is defamatory per se, but in the totality of the Letter, the statement implied to the reader that other undisclosed defamatory facts were the reasons for the filing of three actions and the subsequent withdrawal of the matter from the Commission."  Pl.'s Anapol Br. 24.

As stated in the Letter to the Editor, the Anapol Defendants' summary of the procedural history of the relevant legal actions was accurate.  See JA 1801; Anapol Facts ¶¶ 147-148.  The use of the term "baseless" by the Anapol Defendants does not transform this otherwise accurate summary into a statement with a defamatory meaning.  See Remick v. Manfredy, 238 F.3d 248, 262 (3d Cir. 2001) ("the use of catchy phrases or hyperbole does not necessarily render statements defamatory that would otherwise be non-actionable."); Redco Corp. v. CBS, Inc., 758 F.2d 970, 972 (3d Cir. 1985) (statements can be protected "because they merely involve the use of colorful language and are not defamatory").  Because, as Plaintiff admits, the readers of the Legal Intelligencer are "other lawyers in the profession shared by the Plaintiff," Pl.'s Anapol Br. 24, the audience to which the Letter to the Editor was published was knowledgeable enough to know that parties locked in heated litigation often vigorously defend themselves when their case

becomes the subject of press coverage.  See Remick, 238 F.3d at 262-63 (holding that strong

words, such as "extort," in a publication "written in the context of two lawyers taking

diametrically opposing legal positions" are not defamatory, particularly where "the audience to

which [the] statement was allegedly published knew that it arose from bitter attorney

communications").

Ultimately, Downs asks this Court to read these statements together and glean from them

a defamatory meaning that does not appear in the text of the document itself – that Downs asked

to have his PCHR claim dismissed in order to avoid an adverse ruling in that forum.  Pl.'s

Anapol Br. 24.  However, this Court could only glean such a meaning through an unfair and

forced reading of the Letter to the Editor – something that Pennsylvania defamation

jurisprudence does not allow.  Thomas Merton Ctr. v. Rockwell Int'l Corp., 442 A.2d 213, 217

(Pa. 1981) (a communication "can not be rendered libelous by an innuendo which puts an unfair

and forced construction on the interpretation of the publication") (citation and internal quotation

marks omitted).   Therefore, Plaintiff has not carried his burden to demonstrate that the

statements at issue are capable of a defamatory meaning.  Gibney v. Fitzgibbon, 547 F. App'x

111, 113 (3d Cir. 2013).  Accordingly, the Anapol Defendants' motion for summary judgment

will be granted with respect to this portion of Count II.

3.      Count III – False Light Invasion of Privacy

Under Pennsylvania law, the tort of false light invasion of privacy ("false light") imposes

liability on a defendant who is shown to have: (1) published material that is false; (2) that is

highly offensive to a reasonable person; and (3) acted with knowledge or in reckless disregard of

the falsity of the publicized material.  Graboff, 744 F.3d at 136.  To be highly offensive, the act

of publication must "cause mental suffering, shame or humiliation to a person of ordinary

sensibilities." <u>Larsen v. Phila. Newspapers, Inc.</u>, 543 A.2d 1181, 1188 (Pa. Super. Ct. 1988) (citation omitted).  Alternatively, a false light claim can be established where a defendant discriminately publicizes true statements to imply falsehoods about the plaintiff.  <u>Santillo v. Reedel</u>, 634 A.2d 264, 267 (Pa. Super. Ct. 1993) (citing <u>Larsen</u>, 543 A.2d 1181).  This alternative theory, as recognized by the Third Circuit, is based on the innuendo theory of defamation law.  <u>Graboff</u>, 744 F.3d at 137.

Here, Downs repeats an argument similar to the one made in support of his claim of defamation against the Anapol Defendants.  <u>See</u> Pl.'s Anapol Br. 23-24, 29-30.  Specifically, Downs contends that the Letter to the Editor falsely portrays him as a "serial litigator" and that he "was trying to dodge adverse findings."  <u>Id.</u> at 30.  Downs has not sought to demonstrate that the Anapol Defendants published material that was false, but rather that they engaged in an effort to "falsely portray information."  <u>Id.</u> at 29.

Downs' false light claim fails for two reasons.  First, Downs is unable to demonstrate that the Letter to the Editor constitutes discriminate publication of facts by the Anapol Defendants.  As noted above, the Letter to the Editor's summary of the procedural history of Downs' claims against the Anapol Defendants is factually accurate, and any implied falsehoods that Downs is able to discern from it are neither grounded in reality, nor fairly attributable to the Anapol Defendants.  In publishing the Letter to the Editor, the Anapol Defendants had no obligation to speculate about the motivation for Downs' decision to file actions in multiple fora, or guess about why he withdrew his PCHR complaint before obtaining a determination on the merits.  <u>See</u> <u>Santillo</u>, 634 A.2d at 267 (defendant police officers did not engage in discriminate publishing of facts where they did not affirmatively share positive information with reporters about the plaintiff, a suspect in an ongoing police investigation).  Second, the falsehoods that the Downs

contends are implied from the Letter to the Editor are not serious enough in their nature to support a false light claim.  See Curran v. Children's Serv. Ctr. of Wyoming Cnty., Inc., 578 A.2d 8, 13 (Pa. Super. Ct. 1990) ("It is only when there is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position, that there is a cause of action for invasion of privacy.") (citing Restatement (Second) of Torts § 652E, comment c.).  In Curran, an employer's statements about an employee's poor work performance in the context of an employee performance evaluation were not found to be highly offensive, in part, because an employee should anticipate that their job performance would be evaluated and potentially criticized.  In much the same way, Downs, as a plaintiff suing a former employer that had vigorously denied the allegations against it at every turn, should have anticipated that the former employer would challenge the merits of his claim when faced with media scrutiny about the litigation.  The Anapol Defendants' conduct is much more in line with Curran than it is with cases that have found conduct to be highly offensive.  Accordingly, the Anapol Defendants' motion for summary judgment will be granted with respect to Count III.

B.    **Claims Against the Raynes Defendants**

The Raynes Defendants argue that the Downs cannot establish his claims of discrimination, retaliation, and defamation against them.  Each claim is addressed in turn.

1.    Count VI – Sexual Orientation Discrimination

To prove a prima facie case of discrimination under the PFPO, a plaintiff must show that: (1) he is a member of a protected class; (2) he is qualified for the position; (3) he suffered an adverse employment action; and (4) the action occurred "under circumstances that give rise to an inference of unlawful discrimination."  Johnson v. Pub. Servs. Enter. Grp., 529 F. App'x 188,

191 (3d Cir. 2013).  The Raynes Defendants concede that: (1) Downs, as a gay male, is a member of a protected class; and (2) the withdrawal of the employment offer was an adverse employment action.  Raynes Defs.' Br. Summ. J. ("Raynes Defs. Br.") (ECF No. 52-2) 13.  Even assuming that Downs was qualified for the position at the Raynes Firm,[25] Downs has not presented evidence that the withdrawal of the employment offer occurred under circumstances that give rise to an inference of discrimination.

As previously noted, certain members of the Raynes Firm believed that Downs was gay before the Raynes Firm made him an employment offer.  See supra Section I.C.[26]  Though Downs disputes whether those members of the Raynes Firm could have truly know that he was gay without a direct conformation from him, the parties agree that the Raynes Defendants confirmed Downs' sexual orientation on February 9, 2012, shortly after Downs was hired. 1/13/15 Hr'g Tr. 52:16-53:10; Pl.'s Anapol Br. 13.  Thereafter, during the six-week period from February 9th through late-March, the Raynes Defendants took numerous steps to prepare for and advertise Downs' arrival at the Raynes Firm, all the while having confirmation of his sexual orientation.  Id.; Raynes Facts ¶ 36.  Downs has not claimed that the confirmation of his sexual orientation with the Raynes Firm did anything to negatively impact the number or pace of preparatory steps, and even if Downs had made such a claim, the record provides no support for it.  Downs' only evidence to support his allegation of sexual orientation discrimination by the Raynes Defendants is that they withdrew the offer of employment after finding out about a

---

[25]     Plaintiff and the Raynes Defendants have each raised valid arguments regarding the third element of the prima facie case.  Pl.'s Raynes Br. 5; Raynes Defs. Br. 13.  However, because Plaintiff is unable to establish the fourth element of a prima facie case, the Court need not address their conflicting views on the third element.
[26]     The Raynes Defendants assert that through conversations with LeWinter, certain Raynes Firm attorneys had knowledge of Downs' sexual orientation before the Raynes Firm made him a job offer.  JA 435-436, 492-493, 576, 632.

possible hostile work environment claim raised by Downs at the Anapol Firm.  1/13/15 Hr'g Tr. 57:5-11.

In short, some members of the Raynes Firm believed Downs was gay before the Raynes Firm extended him a job offer, members of the Raynes Firm confirmed that Downs was gay shortly after he accepted the job offer, after confirming that Downs was gay the Raynes Firm took numerous steps to prepare for Downs' arrival over the next six weeks, the Raynes Firm learned about Downs' possible hostile work environment claim against the Anapol Firm in late-March, and Downs' job offer was revoked within days of the Raynes Firm learning about the possible claim against the Anapol Firm. As discussed below, while these circumstances may be sufficient to give rise to an inference of unlawful retaliation, these circumstances do not give rise to an inference of unlawful sexual orientation discrimination.  Because Plaintiff is unable to identify evidence from which a reasonable juror could infer that the Raynes Defendants engaged in sexual orientation discrimination against the Plaintiff by withdrawing his offer of employment, Plaintiff has not carried his burden of making out a prima facie case.  Accordingly, the Raynes Defendants' motion for summary judgment will be granted with respect to Count IV.

2.    Count V - Retaliation

To establish a claim of retaliation under the PFPO, Plaintiff must demonstrate that: (1) he engaged in activity protected by law; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action.  Moore, 461 F.3d at 341.  The Raynes Defendants concede that Plaintiff suffered an adverse employment action due to the withdrawal of the employment offer.  Raynes Defs. Br. 20.  The Raynes Defendants argue, however, that Plaintiff

cannot provide sufficient evidence to make out the first and third elements of his prima facie case of retaliation.

i.    *Protected Activity*

As to the first element, the employee need not make a formal complaint; rather, informal conversations with co-workers can constitute protected activity.  Hazen v. Modern Food Servs., Inc., 113 F. App'x 442, 444 (3d Cir. 2004).  Moreover, "the employee must hold an objectively reasonable belief, in good faith, that the activity" opposed is a violation of law.  Theriault, 336 F. App'x at 174.  Hence, in order for the complaint to be protected, the underlying incident which the plaintiff opposed must be believable to a reasonable person to constitute unlawful discrimination.  Id.  Because no reasonable person could believe a single, offensive remark or occasional comments could violate Title VII, courts have previously held that complaining about isolated incidents does not constitute protected activity.  Id.; see also Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001); Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998); Moyer v. Kaplan Higher Educ. Corp., 413 F.Supp.2d 522, 527 (E.D. Pa. 2006).

However, even when an employee complains about activities which do not amount to unlawful discriminatory conduct, the employee's complaint may be protected in certain situations.  Under the Third Circuit's perception theory,[27] retaliation based on the employer's perception that the employee was engaged in protected activity, even if he actually was not, is actionable conduct.  Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 565 (3d Cir. 2002); Moore,

---

[27]    The Court recognizes that Plaintiff did not explicitly rely on the perception theory in response to the Raynes Defendants' motion for summary judgment.  Generally, "[t]his Court is under no obligation to raise legal arguments overlooked or ignored by the parties."  Millner v. Bayada Nurses, Inc., 2006 WL 231993, at *2 (D.N.J. Jan. 20, 2006).  However, federal courts are afforded discretion to decide issues on grounds not raised by the parties.  See, e.g., Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 441 (1990) (Marshall, J, dissenting) (noting "[o]f course" courts have the power to consider arguments not presented by the parties, and citing Teague v. Lane, 489 U.S. 288 (1989), to demonstrate that the Supreme Court has decided cases based on arguments only raised in an amicus brief).

461 F.3d at 344.  In other words, in proving a retaliation claim, "the factual basis for the employer's discriminatory animus" may be incorrect, so long as the plaintiff shows that "the employer's specific intent was discriminatory."  Fogleman, 283 F.3d at 565.

The parties agree that during the March 27th meeting at the Raynes Firm, Downs denied that he raised a claim of hostile work environment during his March 22nd meeting with T. Anapol.  Raynes Facts ¶ 117; Raynes Defs. Br. 20.  Despite this denial, there are a number of reasons why the Raynes Firm could have reasonably believed that Downs actually engaged in protected activity during his March 22nd meeting with T. Anapol.  For example, the parties agree that on the evening of March 23rd, LeWinter informed Brigham that Downs had "made claims against the Anapol firm."  Anapol Facts ¶¶ 99-100.  Prior to that call, LeWinter had been told by both Weiss and T. Anapol that Downs was complaining of a hostile work environment.  Raynes Facts ¶ 47; Anapol Facts ¶¶ 77, 79.  Also, Downs claims that during the March 27th meeting he informed Brigham and Goodman that he followed up with T. Anapol during the March 22nd meeting about the status of previous complaints of sexual orientation discrimination.  JA 1319.  Further, there is no dispute that Downs described to Brigham and Goodman the allegedly discriminatory treatment he endured during his tenure at the Anapol Firm.  JA 533-534, 552, 1319.  Thus, even if Downs denied raising a formal complaint against the Anapol Firm that would amount to protected activity, a reasonable juror could conclude from these circumstances that the Raynes Defendants believed that Downs engaged in protected activity during the March 22nd meeting.  Therefore, at a minimum, Plaintiff is able to establish the first element of a prima facie case of retaliation under the perception theory.

ii.   *Causation*

In order to demonstrate the causal link between the withdrawal of the employment offer and Downs' perceived protected activity, Downs must show that the perceived protected activity was the but-for cause for the adverse action taken by the Raynes Defendants.  Blakney v. City of Phila., 559 F. App'x 183, 185 (3d Cir. 2014).  But-for causation is a demanding standard and requires the plaintiff to prove that the protected act was *the* motivating factor for the adverse employment action.  Conner, 2014 WL 6973298, at *5.  As noted previously, where there is a temporal proximity of two days, courts have found that such timing is "unusually suggestive of causation."  Blakney, 559 F. App'x at 185 (quoting Jalil, 873 F. 2d at 708); see also Simms v. Trimac Transp. E., Inc., 2009 WL 1587598, at *14 (E.D. Pa. June 8, 2009) (holding a period of twelve days is sufficient to establish causation).  In addition, close temporal proximity can, by itself, establish an inference of the necessary causal link.  Jimmy v. Elwyn, Inc., 2014 WL 630605, at *12 (E.D. Pa. Feb. 18, 2014).  Here, the Raynes Firm withdrew the employment offer five days after being notified that Downs engaged in what was perceived to be a protected activity.  Given this relatively short duration, the causation element can be established based on temporal proximity alone.

iii.   *Legitimate Non-Retaliatory Reason*

To rebut his prima facie case of retaliation, the Raynes Defendants offer several, legitimate, non-retaliatory reasons for the withdrawal of the employment offer to Downs.  The Raynes Defendants assert that as of March 23, 2012, they had obtained information that showed Plaintiff was dishonest.  Raynes Facts ¶¶ 71-72.  According to the Raynes Defendants, the March 27th meeting was designed to give Downs a chance to explain his actions.  However, when Brigham and Goodman met with Downs, the Raynes Defendants claim that Downs' conduct in

that meeting and his responses to their questions demonstrated that he was: (1) dishonest; (2) hostile towards LeWinter – his supervisor-to-be at the Raynes Firm, id. at ¶ 95; (3) unethical, id. at ¶ 96; (4) contradictory; and (5) confrontational, id. at ¶¶ 98-99.  Because the Raynes Firm purports to value excellent judgment, integrity, and honesty in their attorneys, the Raynes Defendants contend that they withdrew Plaintiff's offer because he demonstrated that he did not have the characteristics that the firm desires.  Raynes Facts ¶ 101.

iv.    <em>Pretext</em>

When a defendant responds to a plaintiff's prima facie case with a legitimate explanation, the plaintiff must point to evidence from which a reasonable jury could find the defendant's proffered reasons to be pretext for retaliation or that a discriminatory reason was more likely than not a motivating or determinative cause for the retaliatory action.  Steward v. Sears Roebuck & Co., 231 F. App'x 201, 210 (3d Cir. 2007).  "If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial on a fair number of them, the plaintiff may not need to discredit the remainder … [A] factfinder may rationally disbelieve the remaining proffered reasons."  Id.

Here, the Raynes Defendants have provided legitimate reasons for the withdrawal of the employment offer, such that the burden shifts back to Downs to demonstrate pretext.  In response, Downs asserts that the March 27th meeting was a sham and that the Raynes Defendants decided to withdraw the employment offer once they learned that he raised a hostile work environment claim against the Anapol Firm.  Raynes Facts ¶¶ 92-99; 1/13/15 Hr'g Tr. 92:10-19.  To support his contention, Downs points to the e-mails between S. Raynes and Brigham on March 23, JA 1680 ("so sorry that this has turned out this way," and "if pushed, [LeWinter] will tell [Downs] that we are not hiring him"), and Goodman's memorandum, JA 1599 (the Raynes

39

Firm "had a right to know about [Downs'] issues or claims since [the Raynes Firm] would likely be drawn into them – particularly if litigation ensued against the Anapol firm").  See also 1/13/15 Hr'g Tr. 84:1-4.

Based on the above, there is evidence from which a reasonable juror could conclude that: (1) the decision to withdraw the job offer was actually made on March 23, 2012, days before Plaintiff engaged in conduct that purportedly justified the withdrawal of the job offer; and (2) the Raynes Firm was primarily concerned about the possibility that Plaintiff would file a hostile work environment claim against the Anapol Firm – and that this concern is what motivated the withdrawal of the job offer.  Under either scenario, or a combination of two, a reasonable juror could find that the Raynes Defendants' purported legitimate, non-retaliatory reasons for withdrawing the job offer to Downs were pretext for retaliation.  Because Plaintiff has sufficiently established a prima facie case of retaliation, and has identified evidence that could support a finding of pretext with respect the purported legitimate, non-retaliatory reasons for the adverse employment action, Plaintiff's retaliation claim against the Raynes Defendants must be presented to a jury.  Accordingly, the Raynes Defendants' motion for summary judgment will be denied with respect to Count V.

> 3.    Count VI – Defamation

In Count VI, Downs states a single claim of defamation against S. Raynes based on certain statements contained in emails sent to LeWinter and Brigham.  Pl.'s Raynes Br. 22-23. In particular, Downs focuses on S. Raynes' comments that Plaintiff was "dishonest."  Id. at 23-24.  In an action for defamation, the court must first decide whether the communication at issue is "capable of a defamatory meaning."  Graboff, 744 F.3d at 135-36.  The claim should be dismissed if the statements at issue are not capable of a defamatory meaning.  MacElree v. Phila.

Newspapers, Inc., 544 Pa. 117, 124 (1996).  Further, an opinion is defamatory only if it implies the "existence of undisclosed defamatory facts" on which the opinion is based.  Remick, 238 F.3d at 261.  If the recipient is aware of the underlying facts, then "these disclosed facts are sufficient to characterize Defendant's statements [about] Plaintiff . . . as expressions of non-actionable 'pure opinion.'"  Rockwell, 19 F. Supp. 2d at 406; see also Marier v. Lance, Inc., 2009 WL 297713, at *3 (3d Cir. Feb. 9, 2009); Restatement (Second) of Torts § 566 cmt. b (1977).

According to Downs, S. Raynes' alleged defamatory statements were "[b]ased upon the 'whisper down the lane game' . . . [and] based on what had been told to him by Brigham and now by LeWinter."  Pl.'s Raynes Br. 23.  It is exactly this "whisper down the lane game" flow of information that cripples Downs' defamation claim against S. Raynes.  Crucially, at the time he made the allegedly defamatory statements about Downs, all of the information that S. Raynes possessed about the situation had been provided to him by either Brigham or LeWinter – Brigham at first, and LeWinter in the second instance.  JA 440, 509-510.   Therefore, when S. Raynes subsequently offered his negative opinion about Downs based on these events to Brigham and LeWinter – the sole recipients of S. Raynes' alleged defamatory statements – Brigham and LeWinter were already aware of all the relevant facts underlying S. Raynes' opinion.  To allow an individual to be sued for defamation for stating their opinion to two individuals who were the only sources of the information that formed the basis of the opinion would be "an extraordinary leap of logic."  Neish v. Beaver Newspapers, Inc., 581 A.2d 619, 621 (Pa. Super. Ct. 1990).  More importantly, to allow such a claim would run afoul of Pennsylvania defamation law.  See, e.g., Rockwell, 19 F. Supp. 2d at 406.  Because S. Raynes' emails to Brigham and LeWinter are non-actionable, pure opinion, the complained of statements are not

41

capable of a defamatory meaning.[28]   Accordingly, the Raynes Defendants' motion for summary judgment will be granted with respect to Count VI.

## V.   **CONCLUSION**

For the foregoing reasons, the Anapol Defendants' motion for summary judgment will be granted with respect to Counts II and III, and will be denied with respect to Count I.  The Raynes Defendants' motion for summary judgement will be granted with respect to Counts IV and VI, and will be denied with respect to Count V.

An appropriate Order follows.

---

[28]   Since the Court concludes that the statements at issue are not capable of a defamatory meaning, the Court need not address the applicability of the statute of limitations and conditional privilege defenses.